UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.  Case No:  2:15-cr-1-FtM-38DNF

DANIEL PALMER

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

**I.     Introduction**

This cause is before the Court on Defendant Daniel Palmer's ("Defendant") Motion for Pre-Trial Suppression Hearing and Memorandum of Law in Support Thereof (Doc. 22) filed on March 11, 2015.  The Government filed a Response to Defendant's Motion to Suppress (Doc. 24) on March 24, 2015.  This matter was referred to the undersigned for a report and recommendation and an evidentiary hearing was held before the undersigned on April 9, 2015.  On May 1, 2015, Defendant filed a Supplemental Motion for Pre-Trial Suppression and Memorandum of Law in Support Thereof (Doc. 48).  The Government filed a Response to Defendant's Supplemental Motion to Suppress (Doc. 55) on May 14, 2015.  Defendant is charged with: (1) knowingly receiving and distributing any visual depiction that had been mailed, shipped, and transported in interstate and foreign commerce, and which was produced using materials that had been mailed, shipped, or transported using any means or facility of interstate or foreign commerce by any means including by computer, where the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction is of such conduct in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1); and (2) knowingly possessing one or more matter(s) which contain any visual depiction that had been mailed, shipped, and transported in interstate and

foreign commerce, and which was produced using materials that had been mailed, shipped, or transported using any means or facility of interstate or foreign commerce by any means including by computer, where the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction is of such conduct in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1).  Defendant is seeking to suppress all evidence obtained during a search of his residence on July 31, 2014, and all statements made by Defendant to law enforcement on that date.  For the reasons explained below, the Court respectfully recommends that Defendant's motion be **DENIED**.

### II.     Summary of Evidence

The Government presented the testimony of one witness, Task Force Agent (TFA) Chris Tissot, and entered four exhibits into evidence: (1) the search warrant for Defendant's residence, (2) a transcript of Defendant's first statement to law enforcement, (3) a transcript of Defendant's second statement to law enforcement, and (4) a compact disc containing audio recordings of Defendant's statements.  Defendant presented the testimony of two witnesses, TFA Kevin Bunch and Mr. Richard Connor, and entered one exhibit into evidence, the curriculum vitae of Mr. Connor.

### A. Testimony of TFA Chris Tissot

TFA Tissot testified as follows.  He is a detective with the Charlotte County Sheriff's Office major crimes unit and is currently assigned to the FBI's child exploitation task force in Fort Myers, Florida. (Tr.[1] 11-14).  He has been with the Sheriff's Office for approximately 13 years and with the FBI task force for approximately two and a half years. (Tr. 12).  The primary mission of the FBI task force is to investigate crimes against children using peer-to-peer file sharing

---

[1] "Tr." refers to the Transcript (Doc. 49) of the Motion to Suppress Hearing held on April 9, 2015.

networks. (Tr. 12). He has taken several online basic schools covering investigations into peer-to-peer child pornography and computer forensics. (Tr. 12). These schools covered peer-to-peer investigations in reference to the Ares network, BitTorrent network, and Gnutella network. (Tr. 13). This training taught him how to install law enforcement software, how to query different locations looking for target IP addresses, how to peruse the software that is used, how to read the log files that are associated with the connections established with the target IP addresses. (Tr. 14). TFA Tissot characterized his training as basic. (Tr. 13).

In or about March 2014, TFA Tissot began an undercover investigation into the internet sharing of child pornography using the "Roundup" BitTorrent peer-to-peer law enforcement software. (Tr. 14). The investigation continued until July 8, 2014. (Tr. 17). During the investigation, TFA Tissot downloaded numerous child pornography images and videos from Defendant. (Tr. 18). The images and videos downloaded were described in specific torrent, torrent info hash files that a law enforcement database "knows" are child pornography torrents. (Tr. 18). Another agent, Agent Ewert also downloaded several child pornography files as well. (Tr. 18). TFA Tissot testified that the log files show that he and Agent Ewert's undercover computers connected with Defendant's IP address. (Tr. 19-20). TFA Tissot explained that when law enforcement's program contacts the target IP address, the first thing it does is inquire whether the computer has a certain torrent. (Tr. 20). TFA Tissot testified that in order for law enforcement to download the image and videos which are in Defendant's shared folder that he's actively sharing, he has to have that torrent file on his computer. (Tr. 20).

On July 31, 2014, at approximately 6:30 a.m., law enforcement executed a search warrant of Defendant's residence. (Tr. 27). Law enforcement knocked on the front door and Defendant's mother and brother came to the door. (Tr. 27). Law enforcement explained that they had a federal search warrant for the residence, and that they had to exit the residence. (Tr. 28). The entry team

entered the house with the purpose of clearing it. (Tr. 28). TFA Tissot and another agent came to a locked door. (Tr. 28). TFA Tissot and the other agent yelled to the individual inside the room to open the door. (Tr. 28). When the door was not opened, the other agent forcibly opened the door. (Tr. 28). TFA Tissot explained that they feared someone may be arming themselves or destroying evidence. (Tr. 28). Once the door was opened, law enforcement located Defendant who was standing near his computer. (Tr. 28).

Defendant, his mother and his brother, after exiting the residence, sat on the porch. (Tr. 28). No one was in handcuffs. (Tr. 28). TFA Tissot explained that he was with the FBI and had a search warrant in reference to an internet investigation. (Tr. 28-29). TFA Tissot told them all that they were free to go, that no one was under arrest, that no one was being detained, and that they could walk away at that point. (Tr. 29). TFA Tissot told them that if they chose to stay that their movements would be limited for officer safety. (Tr. 29). Defendant and his family elected to stay and remained on the front porch. (Tr. 29).

At this time Defendant's mother was irate and TFA Tissot starting talking to her in an attempt to calm her down. (Tr. 29). While TFA Tissot was talking to Defendant's mother, TFA Bunch asked Defendant whether he would speak with law enforcement. (Tr. 29). Defendant agreed. (Tr. 29). TFA Bunch and Defendant walked over to his vehicle, a black Dodge pickup, which was parked on the side of the road near the grass by Defendant's residence. (Tr. 29). The pickup truck was not a patrol car, but a rental, and it had no lights, sirens, or cage. (Tr. 30). TFA Bunch went inside the vehicle and started his recorder. (Tr. 30). Defendant walked over to TFA Bunch's vehicle and got into the passenger's side of the vehicle. (Tr. 30).

TFA Bunch and TFA Tissot were wearing casual clothes, like jeans and t-shirts. (Tr. 30). It was muggy and hot at the time the search warrant was executed, and one of the reasons Agent Bunch had Defendant get inside the vehicle was to be more comfortable. (Tr. 31). Also, the vehicle

provided a private area to converse where neighbors could not hear. (Tr. 31). TFA Tissot described the entire conversation as relaxed with Defendant laughing and joking with TFA Bunch. (Tr. 31). During the conversation, TFA Bunch told Defendant he was free to go several times. (Tr. 31). Defendant was told that he was under arrest and was free to go. (Tr. 32). At the conclusion of the interview, TFA Bunch, TFA Tissot, and Defendant exited the vehicle and went to the front porch, where Defendant sat down. (Tr. 34).

TFA Tissot then entered the residence and made contact with special agents and a computer examiner who had been conducting computer previews of Defendant's computer. (Tr. 34). They advised TFA Tissot that there were numerous child pornography files on Defendant's computer (Tr. 34).

TFA Tissot then went back outside to speak with Defendant. (Tr. 34). Defendant agreed to talk to TFA Tissot and TFA Bunch again. (Tr. 34). TFA Bunch and the Defendant walked back to the vehicle and TFA Bunch read Defendant his *Miranda* rights. (Tr. 35). TFA Tissot testified that the reason Defendant was read his *Miranda* rights was because there was a possibility that he was going to take Defendant into custody and was no longer free to leave as he was previously. (Tr. 35).

On cross examination, TFA Tissot testified the BitTorrent software used by law enforcement is different than the software used by the public because it downloads entire files from one user. (Tr. 42). TFA Tissot testified that just because someone has a torrent does not mean that they have child pornography. (Tr. 44-45). TFA Tissot testified that the downloading of a file is achieved through a direct connection between the computer requesting the file and computers sharing the actual file, not the torrent file, but the actual files referenced in the torrent file using any BitTorrent. (Tr. 47). TFA Tissot testified that torrent files do not contain child pornography, but they contain data in reference to child pornography. (Tr. 47).

### B. Testimony of TFA Kevin Bunch

TFA Bunch was called to testify by the Defendant and provided the following testimony. TFA Bunch was a part of the team that executed the search warrant. (Tr. 65). He was asked to interview Defendant. (Tr. 66). TFA Bunch received training in interrogation around 2001 or 2002. (Tr. 67).

When the search warrant was being executed at Defendant's residence, TFA Bunch was standing outside. (Tr. 69). TFA Bunch testified that after Defendant and his family were told they were free to leave, he asked Defendant to have a seat in his vehicle. (Tr. 70-71). TFA Bunch testified that when he conducts interviews he wears a button up shirt that covers his gun. (Tr. 71). He wears the shirt so he can put the recording device in his pocket. (Tr. 72).

TFA Bunch testified that he did not inform Defendant of his *Miranda* rights during the first interview, but he did do so during the second interview of Defendant. (Tr. 73). TFA Bunch testified that he does not attempt to avoid giving a suspect *Miranda* rights during a voluntary interview. (Tr. 75).

### C. Richard Connor

Mr. Connor testified as follows. He majored in history at Princeton University and graduated from Stetson Law School in 1986. (Tr. 77). Starting in 2005 or 2006, he began taking training courses in digital forensics. (Tr. 77). He has several certifications involving digital forensics. (Tr. 81-83).

Mr. Connor testified that he is familiar with peer-to-peer file sharing programs. (Tr. 87). Mr. Connor explained that with peer-to-peer file sharing there is no central server hosting the files shared, but that each user or peer has files being shared by other peers. (Tr. 87). Mr. Connor testified that BitTorrent is a method of peer-to-peer file sharing that relies on a torrent files to find

and download the actual video and picture files. (Tr. 88). Mr. Connor explained that a user downloads a torrent file which tells the torrent software how to go out on to the network and find the different pieces that can be downloaded that will then give the actual pictures and videos referenced in the torrent file. (Tr. 88-89). Mr. Connor testified that the torrent file never contains the underlying files. (Tr. 89). Mr. Connor testified that a torrent file has a .torrent extension. (Tr. 89). Mr. Connor testified that a torrent file has a hash value, which lists the files that are associated with the torrent. (Tr. 90). A torrent file also contains the file name, and file size of the file associated with the torrent. (Tr. 90).

### III. Analysis

Defendant argues that suppression is warranted on three grounds: (1) the Affidavit in support of the search warrant for Defendant's residence contained materially false and misleading information; (2) TFA Tissot and TFA Bunch conducted a custodial interrogation of Defendant without advising him of his *Miranda* rights; and (3) the warrantless searches of Defendant's computer violated the Fourth Amendment because the searches constituted an unlawful trespass by the Government. (Doc. 22 p. 5-6; Doc. 48 p. 3). The Court will discuss each grounds for suppression below.

#### A. Whether the Affidavit in Support of the Search Warrant Contained Materially False and Misleading Information

Defendant argues that TFA Tissot's Affidavit in Support of Search Warrant (Gov.'s Ex. 1) contains numerous false statements. (Tr. 118; Doc. 22 p. 8). In particular, Defendant takes issue with the Affidavit's statements that law enforcement "downloaded several torrent files which contained numerous child pornography images and videos." (Doc. 22 p. 8). Defendant points out that according to the Affidavit itself, torrent files contain only instructions on how a user can download the files referenced in a torrent file and do not contain actual data like child pornography

images or videos. (Doc. 22 p. 8). Defendant contends that because TFA Tissot knew that torrent files only contain instructions and not child pornography images or videos, TFA Tissot acted recklessly in disregarding the terms of his own sworn affidavit. (Doc. 22 p. 9). Defendant argues that once the false statements regarding child pornography images and videos being contained on the torrent files are excised from the Application, the Court is left with insufficient facts to determine how those files containing child pornography were downloaded by law enforcement. (Doc. 22 p. 10).

The Government responds that the Affidavit established probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252 and 2252a existed at Defendant's residence, specifically in the form of child pornography images. (Doc. 24 p. 5). The Government contends that while a ".torrent" file does not contain the desired content, or the actual images of child pornography, it does define the images, and an individual cannot download files that are referenced in a ".torrent" file without actually importing the ".torrent" file into the respective ".torrent" file sharing peer-to-peer program. (Doc. 24 p. 6). Thus, ".torrent" files and the files they reference go hand-in-hand. (Doc. 24 p. 6). According to the Government, " [t]he target (suspect) computer must not only have the contraband files (child pornography videos and images) in the 'shared' directory of their '.torrent' file sharing peer-to-peer program, but the target must also possess the '.torrent' file that the target originally downloaded and utilized to acquire the contraband files." (Doc. 24 p. 7).

The Fourth Amendment protects citizens' right to be free of unreasonable searches and seizures and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "'Probable cause to support a search warrant exists when the totality of the circumstances allow[s] a conclusion that there is a fair probability of finding contraband or evidence at a particular location.'" *United States v. Grice,* 335 F. App'x 924, 926

(11th Cir. 2009) (quoting *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999)). "'The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business.'" *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (quoting *United States v. Procopio*, 88 F.3d 21, 28 (1st Cir. 1996)). An affidavit for a search warrant should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *Id.* (citing *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001)).

To void a search warrant, a defendant must show by a preponderance of evidence that (1) the affiant included in the warrant affidavit "a false statement knowingly and intentionally, or with reckless disregard for the truth," and (2) "the affidavit's remaining content is insufficient to establish probable cause." *United States v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978)). Intentional or reckless false statements or omissions will invalidate a warrant if the true and complete facts would have negated a finding of probable cause. *See United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001) and *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).

Here, there is no dispute between Defendant and the Government that files with the extension ".torrent" do not contain picture or video information. Defendant's witness, Mr. Connor, testified that such files do not contain movies or pictures, but only directions that tell a computer how to get the videos and pictures it references. (Tr. 90). This testimony is consistent with the representations in TFA Tissot's Affidavit, which states that a ".torrent file is the set of instructions the program needs to find the files referenced in the .torrent file." (Gov.'s Ex. 1 p. 10).

The parties differ, however, in their understanding of what constitutes a "torrent" file. Defendant, relying on the testimony of Mr. Connor, would have the Court understand a torrent

- 9 -

file to exclusively mean a file with a ".torrent" extension. (Tr. 89-90). If the Court adopted such an interpretation of the term "torrent file," then the Affidavit's claims that law enforcement "downloaded several torrent files which contained numerous child pornography images and videos" would be false, as such .torrent files do not contain data information such as pictures and videos. The Government, however, would have the Court interpret torrent file more expansively, to include the actual data files that are shared on the BitTorrent network. (Doc. 24 p. 7). The Government notes that law enforcement officers who conduct undercover peer-to-peer investigations on the BitTorrent network commonly refer to the contraband files that are shared by targets as "torrent files." (Doc. 24 p. 7).

In analyzing the Affidavit's usage of the term "torrent," the Court is cognizant that a review of the sufficiency of a warrant application after-the-fact, should not be done in a hyper-technical manner, but rather in a common sense way. *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). Employing a common sense review of the search warrant, the Court finds no reason to constrain the term "torrent" to univocally refer to a file with the extension ".torrent" and instead understands torrent file to include not only files with .torrent extensions, but also the actual data files which have been downloaded using BitTorrent. This understanding of the term "torrent" is consistent with the way the term is actually used. *See A Dictionary of the Internet* (3rd ed. 2013) (defining "torrent" as "[a] file that has been downloaded by means of the BitTorrent technology"). Thus, contrary to Defendant's arguments, the Affidavit's representations that law enforcement "downloaded torrent files which contained numerous child pornography images and videos" were not false.

Even if the Court were to find that the Affidavit contained false statements due to the manner in which law enforcement used the term "torrent file," there is no suggestion that law enforcement included the false statements intentionally or knowingly. Neither does the Court

find that the usage of the term "torrent file" in such a manner as used in the Affidavit was reckless given the common usage of the term and the manner in which law enforcements customarily refers to actual data files containing child pornography images and videos downloaded through BitTorrent software.  Accordingly, the Court will not recommend that any evidence be suppressed on the grounds that TFA Tissot's Affidavit contained false statements.

### B. Whether TFA Tissot and TFA Bunch conducted a custodial interrogation of Defendant without advising him of his *Miranda* rights

Defendant contends that law enforcement engaged in a "bait and switch" with Defendant, initially telling him he was free to go and then immediately asking him to come to TFA Bunch's vehicle. (Doc. 22 p. 14).  Defendant argues that when he attempted to exercise his free will and told TFA Bunch that he did not want to get into the vehicle with him, TFA Bunch ordered Defendant to "just have a seat." (Doc. 22 p. 14).  Defendant argues that given Defendant's attempts to terminate any interrogation and TFA Bunch's refusal to accept Defendant's free will, no reasonable person would perceive that he had freedom to leave. (Doc. 22 p. 15).  Defendant argues that his conversation was an interrogation because the agents should know the questions were reasonably likely to elicit an incriminating response from Defendant. (Doc. 22 p. 15).  Thus, Defendant argues, law enforcement violated his Fifth Amendment rights by failing to inform him of his *Miranda* rights prior to custodial interrogation.  (Doc. 22 p. 16).

The Government responds that Defendant voluntarily engaged in a non-custodial interview with TFA Tissot and TFA Bunch while other officers were executing the search warrant at Defendant's residence. (Doc. 24 p. 9). The Government notes that Defendant was informed several times that he was not required to speak with law enforcement and that he was free to leave at any time. (Doc. 24 p. 10-11).  The Government further notes that Defendant was never placed in handcuffs, the interview was outside his house, he was not restrained during the interview, and he

was not detained after the first interview. (Doc. 24 p. 11). The Government argues that a reasonable person under these circumstances would understand that they were not in custody. (Doc. 24 p. 12). Accordingly, the Government contends, it was not required to inform Defendant of his *Miranda* rights during the first interview. (Doc. 24 p. 12). As to the second interview, the Government contends that Defendant was informed of his *Miranda* rights and, after acknowledging that the understood them, voluntarily waived them. (Doc. 24 p. 13).

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A court must exclude from evidence any incriminating statements made by an individual if, prior to making the statement, the individual was not warned of his right to remain silent and the right to obtain counsel, the so-called *Miranda* rights. *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). Before *Miranda* warnings are required, a defendant must be in custody and under interrogation. *Id*. (citing *United States v. Castro,* 723 F.2d 1527, 1530 (11th Cir. 1984) (per curiam)). "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (citing *California v. Behler*, 463 U.S. 1121, 1125 (1983)). The Court must consider the totality of the circumstances surrounding the interrogation and whether a reasonable man in the suspect's position would feel that "'a restraint on his freedom of movement to such extent that he would not feel free to leave.'" *Id*. (citing *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001)). The test is an objective one from the prospective of a reasonable innocent person, and therefore the beliefs of the defendant and the agents are not relevant. *Id*. (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

Here, the Court finds that Defendant's *Miranda* rights were not violated during his first or second interview with law enforcement. As to the first interview, the evidence shows that the

Defendant voluntarily participated in a non-custodial interview with law enforcement while the search warranted was being executed in his home.  Defendant was never handcuffed or otherwise restrained through the course of the interview.  The interview was conducted in a Dodge pickup truck that was a rental car, not a police vehicle.  The truck did not have a siren or a cage.  TFA Bunch's firearm was not visible during the interview.  A review of the transcript of Defendant's first interview reveals that Defendant was informed at the outset of the interview that he did not have to speak to law enforcement:

> TFA Bunch: Okay.  You understand they're doing a search warrant –
>
> Defendant: Yeah.
>
> TFA Bunch: --at your house.  Okay.  And, uh, do – and oh, so you understand you don't have to talk to anyone?
>
> Defendant: Right.
>
> TFA Bunch: Okay.  Um, but they'll explain everything with the search warrant as – as well as that.  Uh, the only thing I – I mean, I didn't – and you don't have to talk to me.  You can tell me at any time, "Bunch, I don't wanna talk to you."  You know?  No hard feelings.  You know what I mean?
>
> Defendant: Right.

(Gov.'s Ex. 2 p. 4).  Later, during the same interview, TFA Bunch again reiterated that Defendant did not have to speak with law enforcement.  For example,

> TFA Bunch: All right.  Um, all right.  Well, I appreciate you being cool and talk to me.  You know you didn't have to.

(Gov.'s Ex. 2 p. 25).  And, also,

> TFA Bunch: Okay.  Well, thanks.  Again, I appreciate you talking to me.  You didn't have to.  You've been really nice.

(Gov.'s Ex. 2 p. 43). On other occasions during the interview, TFA Bunch conveyed to Defendant that he was free to leave. For example:

> TFA Bunch: If you took off running down the street, you'd do –
> hey, I'd wave to you.

(Gov.'s Ex. 2 p. 56), and

> TFA Bunch: Well, like I said before, man, you don't gotta hang
> with us. (Unintelligible) – hey, you can sit with me
> all day long, if you want.

(Gov.'s Ex. 2 p. 69). The Court has reviewed and listened to the audio tape recording of the interview and finds that there is no suggestion that law enforcement unduly pressured Defendant into continuing the interview and making a statement. Notably, the tone of the interview was so non-threatening and non-coercive that Defendant himself, at the end of the interview, suggested to TFA Bunch that in the future he should "come across a little more aggressive, not so friendly" when conducting an interview. (Gov.'s Ex. 2 p. 70). A reasonable person under the circumstances would have felt free to leave the Dodge pickup and terminate the interview, and thus, Defendant was not in custody at the time of the first interview. Accordingly, as he was not in custody, law enforcement was not required to inform Defendant of his *Miranda* rights at that time.

The Court rejects Defendant's argument that law enforcement impermissibly ignored Defendant's attempt to avoid an interview when he stated that he did not want to get inside the Dodge pickup, where the interview was conducted. Defendant's statement that he did not want to enter the Dodge pickup, when placed in context, does not evidence a desire to not speak with law enforcement. Instead, the transcript of Defendant's first interview shows that Defendant's hesitation to get in the vehicle is due to his concern about his bad breathe:

> TFA Bunch: Hey, what – here, just, uh, come around on this side
> if you don't mind. I'll explain –

| | | |
|---|---|---|
| U.S.[2]: | Have him take a seat? |
| TFA Bunch: | Yeah. |
| Defendant: | (Unintelligible). Honestly, I don't wanna get in. I haven't brushed my teeth yet, so I – |
| TFA Bunch: | Well, I don't mind it. |
| Defendant: | I can taste myself. |
| TFA Bunch: | Just have a seat, so at least the bugs don't come in. I don't care if you didn't brush your teeth or not. |

(Gov.'s Ex. 2, p. 1-2). Defendant was not in custody at the time of the first interview, and no *Miranda* violation occurred.

As for the second interview that was conducted with Defendant, no *Miranda* violation occurred. The transcript of the second interview shows that Defendant voluntarily agreed to speak with law enforcement after being informed of his *Miranda* rights:

| | |
|---|---|
| TFA Bunch: | Okay. Let me at least do this. Um, you have the right to remain silent. Do you understand? |
| Defendant: | Yes, sir. |
| TFA Bunch: | Okay. Anything you say can and will be used against you in a court of law. Do you understand that? |
| Defendant: | Yes. |
| TFA Bunch: | You have the right to talk to an attorney and have him or her present with you before and during questioning. Do you understand that? |
| Defendant: | Yes. |
| TFA Bunch: | If you cannot afford to hire an attorney, one will be appointed to represent you at no cost to you before and during questioning if you wish. Do you understand that? |

---

[2] Unidentified speaker.

| | | |
|---|---|---|
| Defendant: | Yes. | |
| TFA Bunch: | You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand that? | |
| Defendant: | Yes. | |
| TFA Bunch: | Okay. Do you understand each of these rights I have explained to you? | |
| Defendant: | Yes. | |
| TFA Bunch: | Having these rights in mind, do you wish to talk to us now? | |
| Defendant: | Sure. | |
| TFA Bunch: | Okay. And I appreciate that. And again, you – at any time, you can say, Bunch, I don't wanna talk to you, and you can walk out of here any time. Okay? | |
| Defendant: | Right. | |

(Gov.'s Ex. 3 p. 3-4). Defendant clearly waived his *Miranda* rights and voluntarily chose to speak with law enforcement. The Court will not recommend that any evidence be suppressed on the basis that Defendant's *Miranda* rights were violated during either interview.

### C. Whether law enforcement conducted a warrantless searches of Defendant's computer which violated the Fourth Amendment

Defendant argues that law enforcement's proprietary BitTorrent application, referred to as Roundup, allows law enforcement greater access and functions than the public versions of BitTorrent. (Doc. 48 p. 5). Specifically, while the design of BitTorrent was to have each computer only share a "bit" of a file, law enforcement downloaded the entirety of the files from Defendant's IP address. (Doc. 48 p. 4-5). Defendant argues that this violation of the design of BitTorrent, i.e., the taking of entire files off of Defendant's computer in his home, constitutes an illegal trespass and violation of the Fourth Amendment. (Doc. 48 p. 5).

The Government responds that the software Roundup neither searched any non-shared areas of Defendant's computer nor revealed any information that was not accessible to other shared users. (Doc. 55 p. 4).  The Government argues that Defendant had no reasonable expectation of privacy in files located in his shared folder that were accessible to any user on the peer-to-peer network. (Doc. 55 p. 4-5).

As stated above, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and affects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "The Fourth Amendment's prohibition against unreasonable searches and seizures 'protects an individual in those places where [he] can demonstrate a reasonable expectation of privacy against government intrusion,' and 'only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search.'" *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *United States v. Cooper*, 203 F.3d 1279, 1283-84 (11th Cir. 2000)).  "A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (citing *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006)).  The subjective prong requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one society is prepare to recognize as reasonable. *King*, 509 F.3d at 1341.

Although the Supreme Court has not addressed the issue of peer-to-peer file sharing in the Fourth Amendment context, it has held, in a consistent line of cases, that individuals have no reasonable expectation in information exposed to the public or shared with third parties." *United States v. Gabel*, 2010 WL 3927697, at *5 (S.D. Fla. Sept. 16, 2010) (citing *United States v. Miller,* 425 U.S. 435, 442 (1976); *Couch v. United States,* 409 U.S. 322, 335–36 (1973); *Katz v. United*

*States,* 389 U.S. 347, 351 (1967); *Hoffa v. United States,* 385 U.S. 293, 302 (1966)). The Eleventh Circuit has held that a person does not have an objectively reasonable expectation of privacy for the contents of their computer when it is connected to a shared military base's network. *United States v. King*, 509 F.3d 1338, 1342 (11th Cir. 2007).

The Court is unconvinced by Defendant's argument. Rather than evidencing a subjective expectation of privacy, Defendant's participation in the BitTorrent swarm demonstrates the exact opposite. By using peer-to-peer file sharing BitTorrent software, Defendant opened up his computer to allow other users of BitTorrent to access certain files to download. By opening his computer to the public, Defendant negates any claim he may have to subjective expectation of privacy in the files he made accessible to BitTorrent users online. *See, e.g., Columbia Pictures, Inc. v. Bunnell*, 245 F.R.D. 443, 452 (C.D. Ca. 2007) (noting that "[e]ven if the users are engaged in *legal* file sharing, they have little to no expectation of privacy because they are broadcasting their identifying information to everyone in the BitTorrent 'swarm' as they download the file."); *In re Verizon Internet Servs.*, 257 F.Supp.2d 244, 267 (D.D.C. 2003) (finding that "if an individual subscriber opens his computer to permit others, through peer-to-peer file-sharing, to download materials from that computer, it is hard to understand just what privacy expectation he or she has after essentially opening the computer to the world.")).

Defendant makes no claim that law enforcement downloaded files that Defendant did not already make available to the BitTorrent using public. Instead, Defendant argues that by downloading entire files from Defendant, and not just "bits" of files, as BitTorrent was designed to enable, law enforcement impermissibly committed an illegal trespass. This argument misses the point. Defendant made the *entire* files available to the BitTorrent using public. The fact that only "bits" of a file are customarily downloaded does not matter. By making the entire file available for download, Defendant cannot claim any expectation of privacy in the file. As

Defendant does not have an expectation of privacy in the files he made accessible to users of BitTorrent and downloaded by law enforcement, Defendant's Fourth Amendment rights were not violated. The Court will not recommend suppression on this grounds.

### IV. Conclusion

For the reasons set forth above,

**IT IS RESPECTFULLY RECOMMENDED THAT:**

Defendant's Motion for Pre-Trial Suppression Hearing and Memorandum of Law in Support Thereof (Doc. 22) be **DENIED**.

**Respectfully recommended** in Chambers in Fort Myers, Florida on May 18, 2015.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02

Copies furnished to:

Counsel of Record
Unrepresented Parties